UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| JOSEPH MILLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 1:14-CV-149 (CEJ) |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I. Procedural History

On June 15, 2011, plaintiff Joseph Miller filed an application for supplemental security income benefits, [1] Title XVI, 42 U.S.C. §§ 1381–1385, with an alleged onset date of September 21, 2010.[2] (Tr. 137–44). After plaintiff's application was denied on initial consideration (Tr. 87–91), he requested a hearing from an Administrative Law Judge (ALJ). (Tr. 92–95).

Plaintiff and counsel appeared for a video teleconference hearing on May 21, 2013. (Tr. 25–52). The ALJ issued a decision denying plaintiff's application on June 10, 2013. (Tr. 12–20). The Appeals Council denied plaintiff's request for

---

[1] Plaintiff filed an earlier claim for supplemental security income benefits on October 22, 2008, which an ALJ denied on September 20, 2010. (Tr. 53–68). The ALJ reviewing that application found that plaintiff's impairments were not severe as to constitute a disability. The Appeals Council denied review, and the ALJ's decision was affirmed by this court on March 18, 2013. See Miller v. Astrue, No. 1:12-CV-00015, 2013 WL 1103904 (E.D. Mo. Mar. 18, 2013) (adopting the report and recommendation of the magistrate judge).

[2] The ALJ determined that the earliest plaintiff was eligible to receive benefits was the month following the month he filed his application for supplemental security income benefits, but nonetheless considered plaintiff's complete medical history. (Tr. 12, 17, 137). See 20 C.F.R. §§ 416.335, 416.912(d).

review on August 22, 2014.  (Tr. 1–6).  Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II.  <u>Evidence Before the ALJ</u>

### A.  <u>Disability Application Documents</u>

In a Disability Report dated June 15, 2011 (Tr. 154–63), plaintiff listed his disabling conditions as manic depression, bipolar disorder, anxiety, high blood pressure, and back problems.  He listed his height as 6′6″ and his weight as 330 pounds.  In a Work History Report (Tr. 164–79), plaintiff wrote that he had worked as a store custodian for seven months in 2010 and as a dishwasher in a restaurant for two weeks in 2005.

In a Function Report dated June 22, 2011 (Tr. 180–96), plaintiff wrote that his wife took care of their child and dog, helped him take his medications every day, prepared meals, and "help[ed] control [his] life."  Plaintiff did not report any problems with personal care, but wrote that he needed reminders from his wife to shave or get a haircut.  He went outside once a day at most.  Because of insomnia, plaintiff stated that he did not sleep at night.  If he felt well enough, he watched television as a hobby.  Plaintiff was capable of paying bills, handling a savings account, and counting change.  Plaintiff rarely socialized with others, writing that "people [] throw me into a bipolar attack, depression, and sometimes give[] me anxiety attacks."  (Tr. 189).  He wrote that he problems lifting because of swelling back pain.  He also reported having difficulties following instructions and getting along with authority figures.  With respect to his problems handling stress, plaintiff stated that he had been taken to the hospital and "had to stay for 5 or more days." (Tr. 190).  In a Disability Report completed for his appeal (Tr. 205–12), plaintiff did

not report any new illnesses, conditions, medications, or changes in his daily activities.

## B.  Testimony at the Hearing

Plaintiff was 26 years old on the date of the hearing.  (Tr. 31).  He was 6′6′′ and 365 pounds.  He had an eleventh grade education.   He was not working at that time and testified that the last time he worked was in 2006.  He had never worked full-time.   When the ALJ asked him about earnings reported for 2010 and 2011, plaintiff insisted that his wife was the only one who worked in his household.  (Tr. 31–32).  She was employed at a hotel.  Plaintiff stated that he stayed at home and watched television.  However, he needed to get up and move around for 5–10 minutes every 15–20 minutes because of pain in his back.  (Tr. 32–33).  Plaintiff had a driver's license and reported occasionally driving to the store.  (Tr. 34).  He took care of his three-year-old daughter with help from his father who lived with plaintiff and his family.   Plaintiff stated that he did not have any friends.   He attended church about once a month.

Upon questioning by his attorney, plaintiff testified that his manic depression, anxiety and panic attacks limited his ability to work.  (Tr. 35–36).  He stated that it was hard for him to be around people, and he had mood swings and side effects from the medications he took.  He reported having panic attacks for four or five years and currently had them twice a week.  Being nervous or stressed caused his panic attacks.  (Tr. 37).  Going into town, going to the store, and being around people made him stressed or nervous.  The medication he took for his panic attacks took 30–45 minutes to help him.  After a "real bad" panic attack, he felt extremely exhausted.  (Tr. 39).

Plaintiff also stated that he had depression that affected him three days a week.  When he felt depressed, he didn't "want to see the world" and wanted to stay at home.  On the days he was depressed, he would watch television and delay personal hygiene until the evening.  Plaintiff also reported manic symptoms or thoughts that everyone was out to get him.  (Tr. 38).  When he was having a manic episode, he experienced nervousness, shaking, and his heart raced.  These problems occurred every day.  As to the quality of his sleep at night, plaintiff stated that he tossed and turned and had back pain.  (Tr. 39).  Because of sleep deprivation, he felt tired throughout the day.

Plaintiff and his family lived in a one-story house with a yard that his father took care of.  (Tr. 41–42).  The last time plaintiff tried to help his father mow the grass, he felt as if he was having a heart attack.  His last place of employment six or seven years prior was at his father's heating and cooling business where plaintiff helped his father.  He testified that he discontinued this work because he became too tired and out of breath when attempting to move tools and equipment six flights of stairs.  (Tr. 43).  His other past employment was as a dishwasher at a restaurant.  (Tr. 47).

Jo Ann M. Yoshioka, a vocational expert, provided testimony regarding the employment opportunities for an individual of plaintiff's age, education, and work experience.  (Tr. 47–48).  The ALJ first asked Ms. Yoshioka if there was any competitive work for such an individual limited to sedentary, non-public work, with simple, routine tasks.  The vocational expert responded that such an individual would be capable of performing work as a hand almond blancher and an ampoule sealer.  Plaintiff's counsel posed a second hypothetical to Ms. Yoshioka, asking her

to include a limitation that twice a week the person would need an unscheduled work break for 30–45 minutes due to his or her health. (Tr. 48–49). The vocational expert replied that such an individual could not perform the jobs she had mentioned. Because those two jobs are production jobs, the vocational expert stated that an employee could be off task no more than five percent of the time.

## C. Medical Records

On May 1, 2009, an x-ray of plaintiff's lumbar spine showed spina bifida occulta[3] of S1 and slight scoliosis. (Tr. 316). Plaintiff requested osteopathic manipulative treatment for his back pain at the Advanced Healthcare Medical Center on January 8, 2010. (Tr. 309–11). Paul Rains, D.O., provided the treatment to plaintiff's lumbar, thoracic and cervical back, which plaintiff tolerated well. Dr. Rains prescribed plaintiff Ultracet[4] as needed for pain and Flexeril[5] for muscle spasms.

From November 23 through November 27, 2010, plaintiff was voluntarily admitted to the adult psychiatric unit at Twin Rivers Regional Medical Center and placed on suicide precautions. (Tr. 228–43). Upon admission, plaintiff reported experiencing depression, marital issues with in-laws and financial problems. He reported compliance with his medications, but had stopped seeing his psychiatrist and therapist six months earlier. Routine laboratory work-ups were unremarkable, but his urine drug screen test was positive for marijuana. Talia Haiderzad

---

[3] Spina bifida occulta is a common, mild form of spina bifida, where there is a small gap in the spine that usually does not cause nervous system problems or any disabilities. http://www.spinabifidaassociation.org/site/c.evKRI7OXIoJ8H/b.8277205/k.5ED4/Spina_Bifida_Occulta .htm (last visited July 30, 2015); http://www.cdc.gov/NCBDDD/spinabifida/facts.html (last visited Aug. 4, 2015).
[4] **Error! Main Document Only.**Ultracet is indicated for the short term (five days or less) management of acute pain. See Phys. Desk Ref. 1462–63 (60th ed. 2006).
[5] **Error! Main Document Only.**Flexeril is indicated as an adjunct to rest and physical therapy for relief of muscle spasm associated with acute musculoskeletal conditions. See Phys. Desk Ref. 1832– 33 (60th ed. 2006).

estimated plaintiff's Global Assessment of Functioning (GAF) score to be 35[6] the day after he was admitted. Plaintiff was prescribed Cymbalta,[7] Lamictal,[8] and Lunesta.[9] Medical providers enrolled plaintiff in multiple disciplinary psychotherapeutic activities while he was in the unit for supportive psychotherapy. He showed improvement with treatment and no longer had suicidal thoughts or feelings of depression. Plaintiff was discharged on November 27th with a GAF score of 50.[10] Amy Lockhert, M.D. diagnosed plaintiff with severe, recurrent major depressive disorder and recommended lifestyle modifications, cessation of tobacco, exercise, weight loss, and use of Lisinopril[11] and Clonidine[12] as needed.

Plaintiff sought outpatient behavioral care from Patrick Oruwari, M.D., at Potosi Rural Health Clinic on March 29, 2011. (Tr. 247–48). In his notes of plaintiff's medical history, Dr. Oruwari noted that plaintiff's condition was complicated by paranoia and panic attacks. Plaintiff denied drug or alcohol use. Dr. Oruwari noted that plaintiff "gives up easily, which he attributes to his depression." Plaintiff's wife was his only friend and he watched television and

---

[6] **Error! Main Document Only.**A GAF of 31–40 corresponds with "some impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." American Psychiatric Association, <u>Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision</u> 34 (4th ed. 2000).

[7] **Error! Main Document Only.**Cymbalta, or Duloxetine, is used to treat depression and generalized anxiety disorder; pain and tingling caused by diabetic neuropathy and fibromyalgia. www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Oct. 27, 2009).

[8] **Error! Main Document Only.**Lamictal, or Lamotrigene, is used to increase the time between episodes of depression, mania, and other abnormal moods in patients with bipolar disorder. www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on December 17, 2014).

[9] **Error! Main Document Only.**Lunesta, or Eszopiclone, is in the class of medications called hypnotics and is used to treat insomnia. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a605009 .html (last visited on Mar. 9, 2011).

[10] **Error! Main Document Only.**A GAF of 41–50 corresponds with "serious symptoms OR any serious impairment in social, occupational, or school functioning." American Psychiatric Association, <u>Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision</u> 34 (4th ed. 2000).

[11] **Error! Main Document Only.**Lisinopril is indicated for the treatment of hypertension. <u>See</u> <u>Phys. Desk Ref.</u> 2053 (61st ed. 2007).

[12] **Error! Main Document Only.**Clonidine is indicated for treatment of hypertension. <u>See</u> <u>Phys. Desk Ref.</u> 843 (61st ed. 2007). It is also used in the treatment of alcohol and narcotic withdrawal. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682243.html (last visited Mar. 9, 2011).

stayed at home for fun. He wanted to have friends, but said he could not push himself. Plaintiff had stopped seeing his primary care physician because of the prolonged wait time. Medicine helped his condition, but he had run out of his medicine three weeks earlier. He reported experiencing depression with mood swings. He told Dr. Oruwari that he recently had been admitted to psychiatric care for eight days due to suicidal thoughts, but he had never attempted suicide. Upon examination, plaintiff had poor eye contact, slow speech rate, retardation of his psychomotor skills, withdrawn behavior, and coherent process. Dr. Oruwari diagnosed plaintiff with bipolar disorder-depressed, panic disorder without agoraphobia, avoidant personality disorder, and hypertension. The doctor assigned plaintiff a GAF score of 48. He prescribed plaintiff Cymbalta, Lamictal, Alprazolam,[13] and Trazodone[14] and instructed him to follow-up in two months.

Plaintiff returned to see Dr. Oruwari on July 14, 2011 and complained of running out of his medications. (Tr. 260). When he was complaint with his medicine, he reported that he felt better. Plaintiff had not had any recent manic episodes, but still had anxiety with panic attacks. He was mildly depressed that day. Upon examination, Dr. Oruwari noted that plaintiff gave excellent attention to his appearance, had cooperative behavior, good eye contact, normal speech rate, coherent, logical, goal-directed process, and a depressed mood. The doctor assigned a GAF score of 50, and continued him on the same medications with no new diagnoses.

---

[13] **Error! Main Document Only.**Alprazolam belongs to the class of medications known as benzodiazepines and is used to treat anxiety and panic disorders. http://www.nlm.nih.gov/medlineplus/
druginfo/meds/a684001.html (last visited on June 28, 2011).
[14] **Error! Main Document Only.**Trazodone is a seratonin modulator prescribed for the treatment of depression. It may also be prescribed for the treatment of schizophrenia and anxiety. www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Oct. 27, 2009).

On July 27, 2011, James Spence, Ph.D., completed a Psychiatric Review Technique for plaintiff. (Tr. 262–72). Dr. Spence found that plaintiff had a severe, recurrent major depressive disorder, bipolar disorder by history, panic disorder, avoidant personality disorder, and behavioral or physical changes from marijuana abuse. Plaintiff had a moderate restriction of daily living activities and moderate difficulties functioning socially and maintaining concentration, persistence and pace. Plaintiff had had no repeated episodes of decompensation of an extended duration. Dr. Spence noted that plaintiff had had only sporadic follow-up treatment from his in-patient treatment in November 2010. Upon review of plaintiff's medical records, Dr. Spence opined that plaintiff retained the capability to perform simple, repetitive tasks on a regular basis away from the general public.

Also on July 27, 2011, Dr. Spence completed a Mental Residual Functional Capacity Assessment. (Tr. 273–75). Dr. Spence found that plaintiff was not significantly limited in his abilities to remember locations and work-like procedures or to understand and remember very short and simple instructions. Plaintiff was moderately limited in his ability to understand and remember detailed instructions. As to his abilities in sustained concentration and persistence, Dr. Spence noted that plaintiff was moderately limited in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, or work in coordination with or proximity to others without being distracted by them. He was not significantly limited in his ability to carry out very short and simple instructions, perform activities within a schedule, sustain an ordinary routine without special supervision, or make simple work-related decisions.

Plaintiff was additionally moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. As to his social interaction abilities, Dr. Spence noted that plaintiff was moderately limited in his ability to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, and to get along with coworkers without distracting them or exhibiting behavioral extremes. He was not significantly limited in his ability to ask simple questions or request assistance or maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. With regard to plaintiff's adaptation abilities, Dr. Spence opined that plaintiff was moderately limited in his ability to respond appropriately to changes in the work setting, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others. He was not significantly limited in his awareness of normal hazards and ability to take appropriate precautions.

On August 9, 2011, plaintiff had a consultative physical examination with Chul Kim, M.D. at Westwood Medical Clinic, Inc. (Tr. 277–83). Upon review of plaintiff's medical history, Dr. Kim noted that plaintiff had been treated for hypertension for about two years, began having lower back problems when he fell off a horse, and had had bipolar disorder for four years. After the accident with the horse, plaintiff stated that he felt a sharp pain in his lower back running to his right hip whenever he lifted his 30-pound daughter, sat or drove a vehicle for 30 minutes, stood for an hour, or walked for 20 minutes. Ibuprofen did not help with the pain. Plaintiff stated that he had been admitted to a mental hospital three

times, including an admission for six days in November 2010 after he attempted suicide. He said he had attempted suicide a few times in the past and had suicidal thoughts off and on. His medications included Lisinopril, Cymbalta, Lamictal, Xanax,[15] cough syrup as needed, and ibuprofen as needed. Physical examination of plaintiff was normal and his mental state was clear with good memory. Flexion of his lumbar spine, knee, and straight leg raise caused him lower back pain. He also reported frequent headaches and problems breathing when he coughed. Plaintiff's height and weight were recorded as 6′5′′ and 349 pounds. Dr. Kim diagnosed plaintiff with uncontrolled hypertension, chronic lower back pain with probable degenerative joint disease of the lumbar spine, bipolar disorder, morbid obesity, and congenital syndactyly[16] of the second and third toes on his feet with pain. An x-ray of plaintiff's lumbar spine conducted the same day found no evidence of acute injury or destructive process involving the lumbar spine and questionable slight narrowing of the L4-L5 disc space. (Tr. 258–86, 318–19).

On August 12, 2011, disability examiner Dawn Horn completed a Physical Residual Functional Capacity Assessment for plaintiff. (Tr. 75–80). Horn found that plaintiff could occasionally and frequently lift or carry 10 pounds. Plaintiff could stand or walk at least two hours in an eight-hour workday and sit about six hours in an eight-hour workday. Plaintiff was unlimited in his ability to push and pull. Upon review of the medical and testimonial evidence, Horn considered plaintiff's statements partially credible as they were not fully supported by the objective findings on file. With respect to postural limitations, Horn found that plaintiff could

---

[15] **Error! Main Document Only.**Xanax is indicated for the treatment of panic disorder. See <u>Phys. Desk Ref.</u> 2655–56 (60th ed. 2006).
[16] Syndactyly is webbing of the fingers or toes. http://www.nlm.nih.gov/medlineplus/ency/article/003289.htm (last visited July 30, 2015).

occasionally climb ladders, ropes or scaffolds. Plaintiff had no manipulative, visual or communicative limitations. For environmental limitations, plaintiff could have unlimited exposure to extreme cold, extreme heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases and poor ventilation, but should avoid concentrated exposure to hazards due to his hypertension and obesity.

At his appointment at the Potosi Rural Health Clinic on September 12, 2012 (Tr. 322), a care provider noted that plaintiff had been on the same medications since a year prior, and they seemed to be helping. Plaintiff slept fine, was not depressed, had had no recent manic episodes, and did not have suicidal thoughts. He still stayed home most of the time. His mental assessment was normal with "calm, casual" noted and a GAF score of 60.[17] Risperidone[18] was added to his medication regimen. At a follow-up appointment on December 11, 2012 (Tr. 321), plaintiff stated that adding the Risperidone had controlled his anxiety and paranoia. His mood was stable and he was sleeping fine. He was continued on the same medications, assigned a GAF score of 65,[19] and told to return in three months.

### III. The ALJ's Decision

In the decision dated June 10, 2013, the ALJ made the following findings:

1.    Plaintiff has not engaged in substantial gainful activity since June 15, 2011, the application date.

---

[17] **Error! Main Document Only.**A GAF of 51–60 corresponds with "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers)." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

[18] Risperdal is the brand name for Risperidone and is indicated for the treatment of schizophrenia and acute manic or mixed episodes associated with bipolar I disorder. See Phys. Desk Ref. 1677 (61st ed. 2007).

[19] **Error! Main Document Only.**A GAF of 61–70 corresponds with "Some mild symptoms . . . OR some difficulty in . . . social, occupational, or school functioning, . . . but generally functioning pretty well, has some meaningful interpersonal relationships." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

2.	Plaintiff has the following medically determinable impairments: obesity, minimal scoliosis of the lumbosacral spine, hypertension controlled by medication, and infrequent medical attention and treatment for a presumed bipolar disorder, major depressive disorder, and/or anxiety disorder not otherwise specified.

3.	Plaintiff does not have an impairment or combination of impairments that has significantly limited (or is expected to significantly limit) the ability to perform basic work-related activities for 12 consecutive months; therefore, plaintiff does not have a severe impairment or combination of impairments.

4.	Plaintiff has not been under a disability, as defined in the Social Security Act, since June 15, 2011, the date the application was filed.

(Tr. 9–24).

## IV.  Legal Standards

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled."  Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997).  "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion."  Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)).  If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner.  Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months.  42 U.S.C. § 423(a)(1)(D),

(d)(1)(A); <u>Pate-Fires v. Astrue</u>, 564 F.3d 935, 942 (8th Cir. 2009). The Commissioner has established a five-step process for determining whether a person is disabled. <u>See</u> 20 C.F.R. § 404.1520; <u>Moore v. Astrue</u>, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." <u>Lacroix v. Barnhart</u>, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. <u>Pate-Fires</u>, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. <u>Id.</u>

"Prior to step four, the ALJ must assess the claimant's residual functioning capacity ('RFC'), which is the most a claimant can do despite her limitations." <u>Moore</u>, 572 F.3d at 523 (<u>citing</u> 20 C.F.R. § 404.1545(a)(1)). "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations." <u>Moore</u>, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. <u>Wagner v. Astrue</u>, 499 F.3d 842, 851 (8th Cir. 2007); <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the

ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Buckner, 646 F.3d at 558 (quotation and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" Id. (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within

the national economy.  <u>Banks v. Massanari</u>, 258 F.3d 820, 824 (8th Cir. 2001). <u>See</u> <u>also</u> 20 C.F.R. § 404.1520(f).

 If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

## V.  <u>Discussion</u>

After reviewing the evidence in the record, the ALJ concluded that plaintiff's medically determinable impairments were not severe and he thus was not disabled under the Social Security Administration's regulations.  Plaintiff alleges that the ALJ's determination concerning the lack of a severe physical or mental impairment is not supported by the substantial evidence of the record.  Accordingly, the issue for review is whether the ALJ erred in terminating the sequential evaluation process at step two by determining that plaintiff did not have a severe impairment or combination of impairments.

At the second step of review for determining disability, a plaintiff will not be found disabled if he does not have medically determinable physical or mental impairments that are severe.  20 C.F.R. § 416.920(a)(4)(ii).  The claimant bears the burden of proving the severity of an impairment or combination of impairments.  <u>Kirby v. Astrue</u>, 500 F.3d 705, 707 (8th Cir. 2007).  The standard of proof for establishing severity "is not onerous . . . but it is also not a toothless standard."  <u>Id.</u> (internal citation omitted).  To qualify as severe, an impairment must "significantly limit a person's physical or mental ability to do basic work activities."  § 416.921(a).  Basic work activities include physical functions such as walking, standing, or sitting, capacities for seeing, hearing and speaking, understanding and carrying out simple instructions, use of judgment, responding appropriately to

supervisors and co-workers in normal work situations, and dealing with change in routine work settings. § 416.921(b). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." Kirby, 500 F.3d at 707 (citing Bowen v. Yuckert, 482 U.S. 137, 153 (1987)). "The sequential evaluation process may be ended at step two when an impairment or combination of impairments would have no more than a minimal effect on the claimant's ability to work." Simmons v. Massanari, 264 F.3d 751, 755 (8th Cir. 2001); see Kirby, 500 F.3d at 708 (collecting cases in which the Eighth Circuit has upheld the Commissioner's finding that a claimant failed to establish severity).

Considering the record as a whole, the Court concludes that substantial evidence supports the ALJ's finding that plaintiff's physical and mental impairments, considered individually or in combination, were not severe during the alleged disability period. As to plaintiff's mental impairments of bipolar disorder, major depressive disorder, and anxiety disorder, the ALJ noted that plaintiff's psychiatric hospitalization in November 2010 was associated with his noncompliance with taking medications for a period of six months prior to his admission. (Tr. 18). He was noted as doing better when he resumed his medications and had no side effects from the medications. After his hospitalization, he had only sporadic follow-up treatment. (Tr. 272). On several occasions, plaintiff was documented as having run out of his medications when he went lengths of time without scheduling follow-up appointments with his medical care providers. The ALJ considered plaintiff's failure to follow prescribed treatment without a good reason as a basis for finding him not disabled. See Edwards v. Barnhart, 314 F.3d 964, 967–68 (8th Cir. 2003)

(holding that a claimant's failure to pursue regular medical treatment detracts from credibility).  His most recent treatment notes in the record indicated that plaintiff was doing better and Risperidone effectively controlled his hallucinations and paranoia.  His mood was stable, he was sleeping fine, he maintained a calm and pleasant presence, and he reported no recent anxiety.

In considering the four functional areas for determining the severity of plaintiff's mental impairments, the ALJ found that plaintiff had mild or no limitations in his daily living activities, social functioning, concentration, persistence and pace, and episodes of decompensation.  The ALJ noted that plaintiff helped take of his daughter during the day, took care of his own personal care and hygiene, prepared simple meals, drove, went to the store, could manage a savings account and pay bills, attended church and watched television.  (Tr. 16–18).  Some of the physical and mental abilities and social interaction skills required to perform these activities, the ALJ noted, are the same as those required to obtain and maintain employment. The record contained no evidence that plaintiff had experienced any repeat episodes of decompensation of an extended duration.  See 20 C.F.R. § 404.1520a(d)(1) ("If we rate the degree of your limitation in the first three functional areas as 'none' or 'mild' and 'none' in the fourth area, we will generally conclude that your impairment(s) is not severe . . . .").

Noting that the GAF scores in plaintiff's record were of limited evidentiary value, the ALJ gave the GAF scores little weight.  (Tr. 19).  The ALJ noted that GAF scores are subjectively assessed and only reveal snapshots of impaired or improved behavior.  See Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50,746, 50,764–65, 2000 WL 1173632 (Aug.

21, 2000) (the Social Security Administration stating that the "GAF scale . . . does not have a direct correlation to the severity requirements in our mental disorders listings").  Nonetheless, his most recent GAF score was 65, indicating that plaintiff was "generally functioning pretty well."  Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

Additionally, the ALJ gave little weight to the opinion of the state agency psychological consultant, Dr. Spence.  (Tr. 262–75).  The ALJ wrote that Dr. Spence did not have the benefit of considering additional evidence that was only available after the reconsideration determination, including subsequent medical evidence and hearing testimony.  Instead, the ALJ gave more weight to the objective details and chronology of the record.  For example, plaintiff was prescribed routine and conservative treatment, his psychiatric hospitalization was associated with medication noncompliance, he had none or only mild symptoms when he was medically compliant after his application date, he described no side effects from the medications, and his most recent treatment notes indicated good improvement. Based on a complete review of the medical opinions and record evidence, the Court finds the ALJ's conclusion that plaintiff's mental impairments were non-severe is supported by substantial evidence.

As to plaintiff's physical impairments, the ALJ found that the record contained no evidence of any specific or quantifiable impact his obesity had on his functional limitations.  (Tr. 14–15).  As to plaintiff's hypertension, the ALJ noted a single treatment note indicated he had uncontrolled hypertension after the date of his application, but no other cardiopulmonary symptoms or complications were described or treated.  (Tr. 17, 229, 231, 236–38, 279–80).  Finally, as to plaintiff's

scoliosis of his lumbar spine, diagnostic imaging from May 1, 2009 and August 9, 2011 did not support the severity of his allegations or a finding of disability. Reports from x-rays indicated that he had only slight scoliosis and questionable slight narrowing of a disc space in his lower back.  (Tr. 286, 316).  A radiology report from August 9, 2011 suggested that if clinically indicated, an MRI examination from plaintiff's lumbar spine might be helpful for further evaluation. (Tr. 285–86, 318–19).  However, no treating physician recommended and plaintiff did not request further evaluation.

Furthermore, plaintiff's consultative examination with Dr. Kim was generally unremarkable.  (Tr. 277–83).  The ALJ noted that, inconsistent with his allegations, plaintiff was documented as stating at the examination that he was capable of lifting a 30-pound baby, driving a vehicle for 30 minutes, sitting for 30 minutes, standing for one hour, and walking for 20 minutes before developing a sharp pain in the lower back running to the right hip.  The ALJ also noted plaintiff's conduct at the hearing, at which he was capable of sitting for 40 minutes without getting up and standing up and walking out of the hearing at its completion without difficulties with his feet.  (Tr. 18); Johnson, 240 F.3d at 1148 ("[An] ALJ's personal observations of the claimant's demeanor during the hearing is completely proper in making credibility determinations.").

The ALJ discounted plaintiff's allegations and testimony as not fully credible, which plaintiff contends was in error.  See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) ("[An ALJ] may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.").  In his credibility determination of plaintiff, the ALJ cited several substantially

supported bases for his discount of plaintiff's allegations. First, plaintiff's daily activities undermined the credibility of plaintiff's allegations of disabling functional limitations. See Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996) (affirming ALJ's discount of claimant's subjective complaints of pain where claimant was able to care for one of his children on a daily basis, drive a car infrequently, and go grocery shopping occasionally).

Second, routine, conservative treatment was effective without side effects when he was compliant with his prescribed medications. E.g., Renstrom v. Astrue, 680 F.3d 1057, 1066 (8th Cir. 2012) ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling.") (quoting Brown v. Astrue, 611 F.3d 941, 955 (8th Cir. 2010)); see also Milam v. Colvin, No. 14-3240, 2015 WL 4491742, at *6 (8th Cir. July 24, 2015) (finding substantial evidence of claimant's relatively conservative treatment history and long periods of time without any treatment supported the ALJ's discount of a claimant's subjective complaints of pain); Ostronski v. Chater, 94 F.3d 413, 419 (8th Cir. 1996) ("[Claimant's] complaints of disabling pain and functional limitations are inconsistent with her failure to take prescription pain medication or to seek regular medical treatment for her symptoms.").

Finally, on multiple occasions at the hearing, at appointments with medical providers, and in his disability application documents, plaintiff's allegations regarding his work history, drug use, pain, medication effects and medical history were inconsistent with prior statements and past records. (Tr. 16–18); see Polaski, 739 F.2d at 1322 ("Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole."); see also Wiese v. Astrue, 552 F.3d

728, 734 (8th Cir. 2009) ("Indeed, the ALJ wrote nearly four full pages of analysis regarding the consistency between [plaintiff's] self-reports contained in the record, her treating physicians' notes and assessments, the medical evidence and the hearing testimony."); Baldwin v. Barnhart, 349 F.3d 549, 558 (8th Cir. 2003) (finding that inconsistencies in the plaintiff's statements in the record regarding alcohol and drug use supported the ALJ's decision to discount plaintiff's credibility and subjective complaints of pain). Accordingly, substantial evidence in the record supports the ALJ's credibility determination based on his consideration of all of the evidence presented. See Renstrom, 680 F.3d at 1067 ("Because the ALJ gave good reasons for discounting [plaintiff's] credibility, we defer to the ALJ's credibility findings.").

The Court finds that sufficient evidence exists that a reasonable person would find adequate to support the ALJ's decision, and his decision "falls within the available zone of choice." Buckner, 646 F.3d at 556. Thus, the Court is required to "defer heavily to the findings and conclusions of the Social Security Administration" and affirm the decision of the Commissioner. Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010).

## VI.  Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **affirmed**.

A separate Judgment in accordance with this Memorandum and Order will be entered this same date.

CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 7th day of March, 2016.